# Wytheville.

## PEYTON v. STUART.

### June 18th, 1891.

1. CONTRACTS—*Interpretation of parties—Case at bar.*—P. owned $37,500 of
   of stock for which he paid $17,500 in cash, the balance being issued on
   the betterments to the corporation's property, to pay for which its notes
   indorsed by P. & S. and another stockholder were outstanding and
   unpaid. S. bought P.'s stock "on the basis of cost" and $5,000. In
   another similar contract, S. used the same expression, which he inter-
   preted as an assumption of the other party's liabilities as to said corpo-
   ration, and P. was cognizant of that interpretation. S. afterwards paid
   off said notes and sued P. as his co-endorser for contribution;
   HELD:
   > S. is bound by his own interpretation to treat P. as released from all
   > liability as respects said notes.
2. TEST CASE—*Common defence—Case at bar.*—In several suits between same
   parties there was a common defence. Parties agree that one decision
   shall decide all;
   HELD:
   > Such agreement is valid, and on appeal, reversal, or affirmance of one
   > case, governs all.

Argued at Staunton. Decided at Wytheville. Appeal from
decree of circuit court of Augusta county, rendered July 3d,
1889, in a chancery cause wherein William A. Stuart, the
appellee, was complainant, and George L. Peyton, the appel-
lant, was defendant. Opinion states the case.

*W. W. Gordon,* and *James Bumgardner,* for appellant.

*W. J. Robertson,* and *Harrison, & Tucker,* for appellee.

LACY, J., delivered the opinion of the court.

The bill was filed by the appellee, William A. Stuart, on the 28th of December, 1886, wherein it is set forth that on the 14th day of September, 1882, the " Greenbrier White Sulphur Springs Company," a corporation duly incorporated under the laws of the state of West Virginia, made its certain negotiable note in writing, by which it promised to pay, thirty days after the date thereof, at the Bank of Lewisburg, West Virginia, the sum of $4,000 to William A. Stuart, George L. Peyton, and H. M. Mathews, as joint endorsers; that said note was duly protested for non-payment when due, according to law.

Another note, like the foregoing, for $2,000; and another for $7,500, like the foregoing—curtail and discount on this note of $2,605; another note for $5,000—curtail and discount on this of $995.43, and $4,148.05 paid on this note. That all these notes were protested, and not paid by the said " The Greenbrier White Sulphur Springs Company," nor by George L. Peyton, nor by the said H. M. Mathews, but by the said William A. Stuart; that the maker of these notes, the said " The Greenbrier White Sulphur Springs Company," is insolvent, and so is H. M. Mathews, and that George L. Peyton is, as joint endorser with him, bound to pay to him one-half of the money so paid by him, the said William A. Stuart, and that when judgment had been obtained on this indebtedness, and liens secured on the land of the said George L. Peyton, that he, the said William A. Stuart, is entitled to be subrogated to the rights of the creditor as against the said George L. Peyton.

On the 7th of December, 1886, the circuit court of Augusta rendered a decree for the following account:

1st. As to the solvency or insolvency of the Greenbrier White Sulphur Springs Company.

2d. As to the solvency or insolvency of the estate of Henry M. Mathews, deceased.

3d. What amount is due the plaintiff from his joint endorsers for contribution upon the notes filed with the bill, or upon said judgment filed with the bill, or is due said plaintiff from such of said endorsers as may be found to be solvent.

And leave was given the said George L. Peyton to file his answer in this cause in sixty days thereafter, which was done accordingly.

The said George L. Peyton filed his answer, saying that, while he had no independent recollection on the subject, he supposes it is true that the notes described in the bill were executed by the said "The Greenbrier White Sulphur Springs Company," and endorsed jointly by the complainant, the said respondent, George L. Peyton, and the said H. M. Mathews, as alleged, and that originally said Stuart, Mathews, and respondent were jointly and equally bound by said endorsement. Respondent did not know, and called for proof, of any alleged payments made on these by said William A. Stuart. That it is admitted that H. M. Mathews is dead and insolvent; but respondent denies the insolvency of the said "The Greenbrier White Sulphur Springs Company," and the statement that nothing can be made out of it; that so far from being insolvent, that it is possessed of a large amount of good and solvent assets, sufficient to pay all or within a small fraction of its liabilities; that these assets consist of unpaid stock subscriptions, the purchase price of mortgage bonds sold, and of unencumbered real estate, personal property, &c., and that the said complainant is himself indebted to the said company in a sum not less than $94,000 for unpaid stock subscriptions and for bonds of the company bought and not paid for, and that the charge of insolvency comes with a bad grace from him, the said William A. Stuart; that the said Stuart had not been compelled to pay these notes held by him as security for the maker, but had acquired them by purchase at a discount of fifty per cent., and that at the time of the purchase he was legally indebted to the company, and when he acquired the note the

debt became extinguished. That the said Stuart cannot call on the respondent for contribution, because payment has been provided for by placing one hundred and ninety of the mortgage bonds at the par value of $500, that have been deposited with the cashier of the creditor bank as collateral security therefor, and that the said collateral should be exhausted before one of the securities should be held liable for them. That, independently of the question whether the Greenbrier White Sulphur Springs Company is or is not solvent, and of the question whether the said notes or a part of them are or are not secured in other ways, to the exoneration of the said George L. Peyton, the said George L. Peyton denies that there is now any liability on him to the said William A. Stuart on account of the said notes in the said bill described. On the contrary he claims that on account of a contract and agreement to that end, made by the said William A. Stuart, he has been released from all liability for these joint endorsements; that the notes in question were given by the said company for the purpose of raising money to make improvements on the property owned by it, and when endorsed by the said William A. Stuart, Henry M. Mathews, and George L. Peyton, as accommodation endorsers, they being all large and equal stockholders in said company, the money so obtained was used in the improvement and in the furnishing of the property of the said company, and on the basis of improvement so made a large amount of the stock of the company was issued as full paid stock.

On the 4th day of November, 1882, George L. Peyton held $37,500 of the stock of the said company, for which he paid in cash the sum of $17,500, the balance of it being issued in consideration of betterments and improvements placed on the property, and for the payment of which notes of the company were outstanding and unpaid, endorsed by the parties interested in the company.

In this state of affairs, and on the said 4th day of November, 1882, George L. Peyton sold to William A. Stuart all of

his said stock, on the distinct understanding and agreement that said stock was sold on the basis of cost, and that the said George L. Peyton was to be relieved of all liability, as endorser or otherwise, for the debts of the said company, said Stuart agreeing to return to Peyton all of his paper, including interest and discount paid. That said agreement was reduced to writing, as follows:

" RICHMOND, VA., Nov. 4th, 1882.

" I have this day bought of George L. Peyton his stock on the *basis of costs* and $5,000. I am to give him up his paper, including discount and interest paid, and pay Dr. Moorman about $4,000, and enough in addition to make $5,000. Said Peyton is to have his salary on the first of January, so far as it has not been realized from the company, after taking from his account and charging back to said Stuart any board-bill to said Stuart or his family which has been charged to said Peyton. Said Peyton is to throw no obstacle in the way of said company regaining or holding possession of their property, and release any claim I have to any of his salary. And any amount I pay said Peyton on his salary I am to hold as a debt against the White Sulphur.

[Signed] " WILLIAM A. STUART."

That the stock sold, as set forth above, on the 4th day of November, 1882, to said William A. Stuart, was delivered to him, and has been converted to his own use; that under this agreement it was the duty of the said William A. Stuart to pay and take up the said note, on which Peyton was an endorser, to the exoneration of said Peyton, and that there is no liability on said Peyton on account of any of the said notes in the hands of the said Stuart, and the said Stuart has no just demands against the said Peyton for contribution on account of their joint endorsement of the same.

Under the decree of December 7th, 1886, J. W. Green Smith, one of the commissioners of the circuit court of Augusta county, undertook to take the testimony, state the account, and make the report required by the said decree. His report is returned on the 16th day of April, 1889. He says that he gave notice as required by the decree, and on Saturday, the 5th day of February, 1887, at his office in the city of Staunton, being the time and place fixed by said notice, he proceeded to take the account ordered by the decree, but that, not being completed on that day, he adjourned the taking of the same from day to day from that day to the day of making his report—that is, from the *5th day of February, 1887, to the 16th day of April, 1889,* he adjourned the account from day to day; so that for more than two years he adjourned this account from day to day.

On the first account he reported that the White Sulphur Springs Company was insolvent.

On the second, that the estate of Henry M. Mathews, deceased, is insolvent.

On the third branch of the decree, as to what amount is due the plaintiff from his joint endorsers for contribution, he has much to say, which must, under the contention here involved, be carefully considered. He says on the threshold that, before proceeding further, the commissioner would here state that there are now pending before him for settlement and report four several cases—three chancery and one common law— instituted by William A. Stuart against George L. Peyton, in which said Peyton sets up a line of defence common to all four of said cases, which, if sustained, will defeat the said Stuart out and out as to the said Peyton, and it has, therefore, *been agreed between counsel* of said Stuart and Peyton, respectively, that your commissioner, in order to save time, repetition, and expense, may, in this one suit of *William A. Stuart* v. *George L. Peyton,* dispose of all matters as between Stuart and Peyton, making mere naked findings as to Peyton in the other

three cases, and referring to this report for his reasons therefor. So that, by agreement of the parties by counsel, this suit was considered and heard by the commissioner and by the court, which approved and ratified this report in all respects, together with three others, all four depending upon the same question, so that the decision of one is the decision of all four.

We will now, from the said report, see what these four cases are. The first named is the one we have already stated at considerable length.

The second suit is, as the commissioner, Smith, states in this report, by the agreement aforesaid, as follows :

In the chancery cause of *William A. Stuart* v. *Lancaster & Co.*, the plaintiff, Stuart, set up for contribution as against the defendant, George L. Peyton (to say nothing here, says the commissioner, of any contention from his co-defendant, R. A. Lancaster), two negotiable notes executed by said corporation, " The Greenbrier White Sulphur Springs Company," duly organized December 29th, 1880, under its charter granted on the 6th day of December, 1880.

First. A negotiable note of $10,000, due four months after date, dated August 16th, 1881, payable at the Bank of Lewisburg, West Virginia, executed by the said corporation, " The Greenbrier White Sulphur Springs Company," and jointly endorsed by the said William A. Stuart, George L. Peyton, Henry M. Mathews, and R. A. Lancaster, who signs himself R. A. Lancaster & Co., the same having been duly protested, according to law, at maturity, for non-payment, and afterwards paid alone by the said William A. Stuart, one of the endorsers thereof.

Second. Another negotiable note of $6,550.83, of date of August 9th, 1881, due at four months after date, payable at the office of P. C. Barber & Co., Baltimore, Maryland, executed by said corporation, " The Greenbrier White Sulphur Springs Company," and jointly endorsed by the said William A. Stuart, George L. Peyton, H. M. Mathews, and R. A. Lancas-

ter, who signed himself R. A. Lancaster & Co., duly protested, according to law, at maturity, for non-payment, and afterwards paid in full by the said Stuart alone.

The third case : A case at common law pending in the circuit court of Augusta, under the style of *William A. Stuart* v. *George L. Peyton*, wherein the said Stuart sues the said Peyton as first endorser on a certain negotiable note in the amount of $5,000, due November 15th, 1881, payable at the Bank of Lewisburg, West Virginia, executed by the said "The Greenbrier White Sulphur Springs Company," severally endorsed—first, by George L. Peyton; second, by said William A. Stuart; third, by R. A. Lancaster & Co., and which was duly protested; to which Peyton filed $5,000 as offset, and Stuart filed counteroffsets, as follows—$20,000; as to which $20,000 Peyton contends the proceeds, to the extent of every dollar, was expended improving the property of the White Sulphur Springs Company.

The fourth suit is that of *William A. Stuart* v. *George L. Peyton*, seeking by creditor's bill, to set up a lien on Peyton's real estate, one third of $27,519.30, the amount of the recovery by *J. Fred. Effinger, &c.* v. *Stuart, Peyton, Camden and Thompson*, said liability haven arisen out of a purchase made by said Stuart for himself and his associates of certain furniture, live stock, &c., from George L. Peyton & Co., composed of J. Fred. Effinger, R. H. Catlett, George L. Peyton and others ; which is defended by said Peyton upon the ground that it formed a part of the cost of his stock, and is covered and indicated by the words " basis of costs " in the contract of November 4th, 1882.

The said commissioner, Smith, having thus stated in detail the grounds and causes of the several actions brought by the said William A. Stuart, proceeds to state the relations of the parties previous to the commencement of this litigation. He says that in 1879, and for several years previously, the White Sulphur Springs realty was in litigation, under the control and

custody of the courts of West Virginia; that the partnership firm of George L. Peyton & Co., composed of R. H. Catlett, J. Fred. Effinger, George L. Peyton and others, were lessees of that property from the court, their lease to expire on the confirmation of a sale thereof, which had been decreed to take place on the 30th day of March, 1880; that William A. Stuart was a large encumbrancer of the said realty, and interested in a profitable management of the property, and agreed with George L. Peyton and J. N. Camden that the three would form a joint-stock company upon the basis of one-half to be held by Camden, who was to take in H. M. Mathews to share with him when it could be done, H. M. Mathews not to be known in the purchase, which was to be made on behalf of the said joint-stock company; but there was a side contract between Camden and Mathews, by which this was agreed between them; that Stuart was to hold one-fourth of the stock, and George L. Peyton one-fourth; that Stuart was to buy at the price of $340,000 for himself and his associates; that this arrangement was perfected, and Stuart became the purchaser and Camden turned over to H. M. Mathews a one-fourth interest in the stock, and subsequently assigned to one W. P. Thompson one-eight interest, or one-half of his one-fourth.

On the 1st day of May following, R. H. Catlett, acting for himself and his other partners, Effinger, Peyton & Co., sold the personalty belonging to them to the said William A. Stuart, who was acting for himself and his associates, at the price of $35,000, and this furniture taken and used and contributed to the production of the alleged $56,488.91, net profits of the Springs during the summer of 1880, and formed a part of the basis on which the $150,000 of the stock was issued as full paid-up.

The commissioner then says, as to the contract of purchase by Stuart of Peyton's interest in the Springs, made on the 4th day of November, 1882, as this is a common defence against all the other claims set up by Stuart in these four several suits,

on the grounds of said Peyton's endorsement of the several negotiable notes of the Greenbrier White Sulphur Springs Company, commissioner will take up all of the said claims and discuss them simply in the light of the paper claimed and filed by Peyton as the original contract of sale of his stock, November 4th, 1882.

He says that Peyton claims that every dollar realized by the corporation, the said " The Greenbrier White Sulphur Springs Company," on discount by the banks of its sundry notes, endorsed by Peyton, in all but one instance, jointly with other company stockholders, and now asserted in the plaintiff's (Stuart) bill, went into the improvement and furnishing of the Springs property; that the stock was issued on the basis of these improvements; that the liability assumed by Peyton endorsing these notes was assumed by reason of his being a stockholder, and as a part of the stock transaction; that, had the notes been paid by the company out of its profits, he, as a stockholder, would have contributed his part of the profits, and, if he had to pay individually, the payment would be on account of the stock, and that the terms of the sale, " on the basis of costs," would naturally, and by ordinary interpretation, include all these asserted liabilities, thereby relieving Peyton therefrom, independently of the verbal agreement at the time.

The commissioner found against Peyton in all the cases, made an elaborate report in this case, to be applied in its effects to all the cases, and made formal findings in the other cases, and the circuit court sustained the commissioner in all his findings.

When the commissioner's report was filed, in April (as has been stated), 1889, Judge Sheffey, the able and leading and managing counsel for Peyton, had just died, and the court met in twenty days, and the defendant was not able to supply the place of Judge Sheffey with a lawyer who could give sufficient attention to the case, as the circuit court was then in session, and all the lawyers were full of their cases in which they had

been already retained, and moved the court for a continuance, but the court overruled the motion, and ruled that the case must be tried at that term. An able lawyer was then retained, who moved for a continuance, and assured the court that, in view of the immense record to be studied, it would be impossible for him to do justice to his client or to himself, but the court insisted that the case must be heard at that term, and gave an indulgence of a few weeks; to which refusal to continue the case the defendant refers as error in this court.

The case being submitted, the circuit court decreed against Peyton in all the cases, and he applied for and obtained an appeal to this court.

The question as to a continuance of the cases under the circumstances lies at the threshold of the cases here, but for the present it will be waived, and we will consider first the main question, which affects and controls not only this case, but the other three set forth in the commissioner's report.

The agreement of the parties being that, to save expense and delay, all the cases should be considered and determined along with this. The defence set up in each case being the same, and the evidence in each case being the same, there is no controverted fact not common to them all; and it was competent for the parties, plaintiff and defendant, to agree as they did agree, to make no contest except in this case, and the result of this must, therefore, determine them all. The findings in the other cases being merely formal, no formal appeals have been taken in them, and none could be taken, as there were none but formal findings therein, and so no errors apparent on the face of the record. But this appeal, when decided, will decide them all, as the contract between the parties on the subject is a valid and binding one, and will be enforced for or against either party, as the result may determine. And if the circuit court's decree in this case be affirmed, the findings in all the cases will stand affirmed; whereas, if the decree of the circuit court shall be reversed in

this case, by agreement of the parties, the formal findings in the other cases will be annulled by proper order in this court in these causes.

We will now consider the main—indeed, the only—defence set up by Peyton, which is relied on to defeat all of the said actions. We have said enough to make it clear that the execution of the notes of the said The White Sulphur Springs Company, and their endorsements, are not denied. It appears, however, that they were executed for the common benefit of all of the incorporators of the said company, and the money raised upon them applied likewise, to the common benefit; that Stuart and Peyton were, with others, stockholders in large amounts of the stock of this company, which owned the White Sulphur Springs property; that there were debts due by the company; that the property was valuable, and its future believed to be promising, the net profits for a single season being stated on the books of the concern at $56,000. The debts of the old concern, still unpaid, gave trouble to the management, and the matter was still in litigation, and in the hands of the court.

In this state of affairs, Peyton, the owner of four hundred and ten shares of the company's stock, was appointed by the court, the court's custodian, and it was expected that at the next term of the court he would be appointed receiver of the property, and he was also the manager of the business, being a practical hotel man.

Stuart was a large encumbrancer of the property, and anxious to formulate some plan by which he could make the place more profitable. He turned his eyes now to the wealthy and skillful architect of the Hygeia Hotel, at Old Point, Harrison Phœbus. The extension of the Chesapeake and Ohio railroad line to Newport News and to Old Point, where the Hygeia Hotel stood, having connected these two great rival public resorts by a continuous all-rail line, he procured the presence of Henry M. Mathews and of Mr. Phœbus at the

Exchange Hotel, in Richmond, and opened negotiations to lease the White Sulphur to Phœbus. Pending these negotiations, which were conducted without notice to Peyton, by accident Peyton visited the Exchange Hotel and came upon them. Henry M. Mathews, soon after Peyton's arrival, told him it was proposed to lease the Springs to Phœbus. Peyton forthwith announced his purpose to lease them himself.

The next morning Stuart announced to Peyton that, to be frank with him, they had already agreed with Phœbus, and he was to be there that day to close the matter. Peyton objected now in earnest, and announced his purpose of striking for control of the property by securing the aid of the creditors, some of whom were already with him ; this to Governor Mathews, who told Stuart, and returned to Peyton with the information *that Stuart would buy him out*, and negotiations to that end at once began in earnest ; and Stuart asked Peyton if he would sell out, as he said he would, what terms would he make ? Peyton replied that, if Stuart would pay him $5,000 bonus, and release him from all responsibility for the company, and all responsibility and liability to him, he would close with him. Stuart, having planned to substitute Mr. Phœbus for Peyton, asked Peyton to give him an option, and wanted ten days. Peyton told him he could have until 12 o'clock that day. Stuart objected to the shortness of the time, and Peyton agreed to extend it to 3 o'clock of that day. Stuart then commenced to prepare the option proposition, which is exhibited with the deposition of Stuart; and is as follows :

" I, George L. Peyton, do hereby sell to W. A. Stuart my stock in the Greenbrier White Sulphur Springs Company of West Virginia, on the basis of costs, which cost is represented by my notes in the hands of the said Stuart, and the matters of discount and interest paid for me by said Stuart. These notes are to be returned to me as paid out. In addition to the above, said Stuart is to pay my debt to Dr. Moorman (of about

$4,000), and enough in addition to make the sum of $5,000, within *ten. or fifteen* days.

" This contract is binding on me until 3 o'clock this P. M., between now and which time Stuart is to accept the same. in writing, if he so elects, and place said writing of acceptance in my hands."

A line appearing run through the words, " in. addition to the above, said Stuart is to bear said Peyton's share of his liability." The whole of this paper is written in.the handwriting of said William A. Stuart, and the word " liability " is followed by full stop or period, showing that the sentence was completed.

4th. In addition to the above, it further agrees that said Stuart will pay to said Peyton the amount of his (Peyton's uncollected) salary for the present year, up to the first day of January, including the amount of board-bill for Stuart and family at the White Sulphur Springs during the past summer, which was paid by said Peyton for Stuart, and credited to the one-fourth of the superintendent's salary, to which the said Stuart was by contract entitled.

" Witness my hand and seal November 4th, 1883.
" George L. Peyton, [S.]

" I further agree to put no obstacles in the way of said Stuart and his associates in their efforts to regain and hold control of the said Greenbrier White Sulphur Springs.
" George L. Peyton."

" I accept the above.
" W. A. Stuart."

" November 4th, 1882.

" Above acceptance in time.
" George L. Peyton."

The defendant, George L. Peyton, gives his version as to the erased words inserted above, with a line drawn through them— " in addition to the above, said Stuart is to bear said Peyton's share of his liability "—as follows:

· " Stuart was writing, and when he got there he said : ' If we refer to the indebtedness of our company, Phœbus is very · scary, and if he should find out the large indebtedness of the company it might defeat my agreement with him.' We then discussed the matter verbally, and he agreed to give me the protection from the debts of the company as I had proposed. He then erased from the option proposition, as he had written it, the provision releasing me from the debts of the company; but it was distinctly understood and agreed between us that I was to be protected by him from all liability for said debts. A very short time after I had given him this option paper, I thought it would be safer for me to have our verbal understanding in writing, and I had another paper prepared protecting me on the line on which we had agreed. He declined to sign the paper, and we did not discuss it all. I then made up my mind that we could not trade, and went to work on my plan of securing the creditors' debts. Some hours after the time had passed limited for the acceptance of my option, he came to me and said he was behind time, but proposed that we go to a room and have some talk. We did so, and after very little talk we agreed on the contract of November 4th, 1882, filed with my answer, and I accepted it as a clear acquittal, believing that it would, as it was intended to do, protect me from all liability for the debts of the company and to Mr. Stuart. The term, ' basis of costs,' as used in that contract, was used, and was intended to mean, and was claimed by me and admitted by him to mean, to release me from all responsibility for the company and to Mr. Stuart. These were the only terms on which I would agree to sell out, and this was the distinct agreement and understanding beetween us at the time of the execution of that paper."

He says, farther, that all the proceeds of the notes he had endorsed for the company were used for the improvement and furnishing the Springs property, and were partly the basis for issuing the stock which he held and sold to Mr. Stuart on the basis of costs, and it was so understood and agreed at the time.

" At the time we traded I held Mr. Stuart's receipt for three hundred and seventy-five shares of the stock and was, besides, entitled to thirty-five additional shares, making in all four hundred and ten shares, worth at par $41,000. Mr. Stuart had advanced for me, as part payment of this stock, the sum of $17,500, and held my notes for that amount, and the interest and discount he had paid on it.

" This was all I owed him at the time, except my notes of the company endorsed by me, which he had before that time paid and then held. The trade was intended to be a complete settlement of all matters between us, and left me without any interest in or liability for the company, or responsible to him.

" It is not reasonable that I would have surrendered my rights in the company, and still left myself liable for the notes of the company I had endorsed. The agreement was that I was to be paid the $5,000 in cash; and when he found I was going to pay Dr. Moorman this debt he suggested the provision as to Dr. Moorman, because he thought he could get indulgence from the Doctor.

" On the 18th of the same month Stuart wrote to me, and asked indulgence on the money he was to pay me until the 1st of January following. This letter asking indulgence at my hands was written fourteen days after his contract, at a time when he had in hand notes of the company endorsed by me, and which he had paid, and would have been an offset as well then as now."

Since the 4th of November, 1882, Peyton never endorsed any renewal of any note, nor had any business transaction with Stuart.

This is Peyton's version of the agreed meaning of the words " basis of costs " at the time. Stuart now denies this, and contends that he only agreed to give Peyton for his stock what he had paid for him on the stock, about $17,500.

The term *basis of cost* has had a construction put upon it by Stuart in the progress of these transactions. Mr. Stuart testifies that early in 1881 Camden and Thompson sold their stock to R. A. Lancaster on the *basis of costs*. Upon turning to that sale by Camden and Thompson of their stock in this company, which Stuart says was on the *basis of costs*, we find what Mr. Stuart's definition of this term is when it does not affect him. It is in part as follows:

" The object of this agreement being to substitute the said R. A. Lancaster to all the rights of said Camden and Camden and Thompson in said contract, and in the company formed under the same, as if the said R. A. Lancaster had been in it from the beginning, and the said Robert A. Lancaster on his part agreeing and hereby obligating himself to protect and fulfill all the obligations of the said Camden and Camden and Thompson, and to save them harmless and acquit from all liability as fully as if the said Robert A. Lancaster had been the original party to the said contract instead of said Camden."

Mr. Stuart used this language when he traded with Colonel Peyton, and this is the meaning which Peyton says Stuart put upon the words at the time; but Stuart says he meant nothing of the sort. That when he was trading with Peyton, basis of costs meant what Peyton's stock had cost Stuart in the way of loans; and that he received Peyton's stock, worth $40,000, and all of Peyton's interest in the White Sulphur Springs Company, of which he was one-fourth owner and superintendent with a large salary, for $17,500 and $5,000 more, and, while Peyton gave up all interest in the Springs, and all hope of ever making anything out of them, yet he stood sponsor for the company's debts, created for betterments on the Springs, for the amount set forth in his several suits, and stated above.

But when *basis of cost* was used between Lancaster and Camden it *meant basis of cost.*

But again, Mr. Stuart has put his own interpretation in writing upon this term within a few days after he made the purchase of Peyton and made the sale to Mr. Phœbus.

Here is the letter of Stuart to Peyton, written shortly after he agreed to buy Colonel Peyton's stock on the basis of costs:

"Nov. 18th, 1882.

*"Col. Geo. L. Peyton:*

*"Dear Sir*—I have seen Dr. Moorman, and told him of our trade. *He does not care* to have his money just now, and hope it will be agreeable to you to let it stand till next fall, unless the Doctor desires it sooner. I would like you also to indulge me a little on the balance that will be due you—say till Jan. 1st. I know you would have done this if I had asked it in Richmond, but after I had sold the interest to Phœbus I was too much hurried to ask you. Phœbus had to leave at 4 o'clock, and I had to see him again. I get nothing from him under a year.

[Signed] "W. A. STUART."

Wants time, then on the Moorman debt; in these proceedings (and there have been no subsequent transactions between him and Peyton), he repudiates it altogether; politely asks for indulgence on the thousand dollars due Peyton—asks indulgence for a short time—say till January 1st. He now offsets Peyton's offset of this two thousand dollars with a counter-offset of more than $20,000 due to him from Peyton, by his insistance in this suit at this very time, when, if he is right now, Peyton should have begged indulgence from him for more than $70,000. The short indulgence asked was granted, and the time running out, and thirty days more, Peyton drafted on Stuart for $300, a part of what was due him, but Stuart refused payment, and spoke of these notes. Peyton promptly replied:

" As to the claims of which you speak, *they were all in exist-
ence at the time our contract was made, and you had paid some of
them at that time, as I understood.* And I suppose, moreover,
that the claims are amply secured, and you, yourself, hold in-
demnity in your own hands—in the greater part of them, if
not for the whole. It is a matter of inconvenience to me to
go without the money due me, small as the sum may be re-
garded. I will remind you of the fact that 190 bonds, of $500
each, are held by Alex. F. Mathews (the bank cashier) as col-
lateral security for the notes you refer to.

[Signed] " GEO. L. PEYTON."

"*Feb. 23d, 1883.*"

The learned counsel for the appellant has referred us to
many circumstances, which show in the record that Stuart's
memory was very frail, and where he appears to be contra-
dicted by incontrovertible circumstances, and, indeed, by his
own admissions.

We have given these careful examination and consideration,
and we find them in every case sustained by the record; but
we cannot follow that line of discussion further within the rea-
sonable limits of an opinion already too long. But upon con-
sideration of the whole record, we find no difficulty in arriving
at our conclusions.

Stuart had seen Camden and Camden and Thompson
bought out by Lancaster upon the basis of costs, Lancaster
stepping into the shoes of Camden and Camden and Thomp-
son, receiving their share of the stock and of the property,
and assuming all the liabilities of the company so far as Cam-
den and Camden and Thompson had done so, letting out the
latter, who transferred to Lancaster, as the contract states,
" without recourse or future liability in any form," and, being
dissatisfied with Peyton, who was the superintendent upon a
large salary, and who had the authority of a sort of receiver

from the court holding the property in litigation, and not being able otherwise to get him out and substitute in his stead a famous hotel-man, Mr. Harrison Phœbus, who had developed the Hygeia Hotel, and with it an immense fortune, proposed to buy Peyton out upon the basis of cost, as was understood between them, in the light of the Camden and Lancaster trade, for Peyton, of course, knew as much about this contract as Stuart did. He entered into the contract—the subject of this controversy—by which he not only secured one-fourth interest in the stock and the Springs property, but made vacant the place of superintendent and receiver, and opened the way to lease the property to Mr. Phœbus, which was accomplished.

On November 18th, when he so politely asked indulgence of Peyton, Peyton's time was not out, and January 1st was named. When that time came he took no notice of Peyton nor of his contract; but when, after waiting thirty days, Peyton drafted for $300, he dishonored the draft, and began this controversy, by which he has caused all of his contracts with Peyton to be set at naught, not only not paying Dr. Moorman, not only not paying Peyton, not only not returning to Peyton his paper, with interest and discount as paid, but, sweeping away every defence set up by Peyton, he has overwhelmed him, by the help of the commissioner and the circuit court, under a load of debt of $70,000 and more, on account of these very debts of the company which passed under his control into his hands, and which he agreed to pay with the property Peyton turned over to him. He has all of Peyton's interest in the Springs property, and holds Peyton bound for the debts contracted by the company in making the Springs property what it is; has Peyton's $35,000 worth of furniture (by his own valuation) for nothing.

This is the result of the court's decrees and orders in these four suits. We are of opinion that they are wholly unsustained by the facts in this record. Peyton's defence, as we

have seen, is set up against, and is a valid defence to each and
every of these four suits, and, as such, will be upheld by proper
orders here and will be enforced against the said Stuart in
each suit.   And as Stuart has not paid, but repudiated his
obligation to pay Dr. Moorman the $4,000 which Peyton
owed him, and which he agreed to pay him, Peyton being left
to take care of that himself, a decree will be rendered here
against said Stuart for the $5,000 due Peyton, with interest,
and the other suits ordered to be dismissed.

And the decrees and orders appealed from here are wholly
erroneous, and must be reversed and annulled.

FAUNTLEROY, J. (dissenting), said :

We, Judges Lewis and Fauntleroy, dissent, *in limine*, from
the opinion of the majority of the court in this case; and
enter of record our protest against it.

The law is a science, embodying principles and rules of evi-
dence and practice designed to prevent the perversion of judg-
ment and justice, and the subversion of those rules and modes
of procedure which are the panoply of *right*, and the protec-
tion against *wrong*.

The petition and the appeal allowed in this case, present
and bring up for the lawful cognizance of this appellate court
the one only suit or cause complained of or referred to in the
petition for appeal from the final decree of the circuit court of
Augusta county, in the chancery suit of William A. Stuart
against George L. Peyton, entered on the 3d day of July,
1889, in favor of said Stuart against said Peyton for the sum
of $6,198.27, with interest upon $4,800.21, part thereof, from
May 1st, 1890, and costs, together with $175, part of the fee
of the commissioner allowed by the court in the said case.
The appellant says in his petition for appeal, after stating this
single, simple decree : " This is the decree here complained
of ", and " he prays that the aforesaid decree of July 3d, 1889,

be set aside and annulled, *and that this cause be reheard.*" It is not pretended that anything else but that decree is mentioned, referred to, or embraced in that petition or in this appeal allowed thereon; yet the sweeping decision of the *majority* of this court, in redundant favor of the appellant, George L. Peyton, not only reverses the palpably faultless action of the circuit court of Augusta county, based upon the elaborate investigation and report of the master, to whom the cause was referred, and the full, clear and conclusive evidence returned with his report; but, along with this cause, actually dismisses and summarily strikes from the docket of that court, *three other distinct, separate and different* causes, *in which no appeal* has been taken—one a final judgment in a common law case, nearly two years ago, not appealed from; one a chancery suit in which there are other parties defendant beside George L. Peyton, with other rights and interest to be settled, and in which the evidence has not yet been taken; and still another, a creditor's bill, suit against George L. Peyton, which is resting upon an unexecuted decree for sale by commissioners appointed to sell Peyton's realty for benefit of his creditors. Even if Peyton were the only party defendant to these suits, they could not be lawfully or properly considered, much less be stricken arbitrarily from the docket by this appellate court, unless and until they were here *on appeal.*

The opinion of the *majority* of the court says: " By agreement of the parties, by counsel, this suit was considered and heard by the commissioner and by the court, which approved and ratified his report in all respects, together with three others, all four depending upon the same question, so that the decision of one is the decision of all." There is no evidence in this case to warrant this predication. An examination of the pleadings in these four causes shows that they are *necessarily* separate and distinct suits, which could not, by any agreement between the parties or their counsel, be legally heard together or be disposed of as one case. Each one of

them is a separate and distinct proceeding, each resting upon
its own merits and circumstances; and the circuit court re-
fusing to allow them to be consolidated or even heard together,
and making separate orders of reference and requiring sepa-
rate reports; and the counsel for appellant taking and filing
exceptions in the court below in each separate case. In one
of the cases—that of W. A. Stuart against George L. Peyton
and Lancaster & Company—a chancery suit, there has, as yet,
never been any report; and surely there could not have been
any propriety in consolidating a chancery suit against Lan-
caster & Company with a common law suit against George L.
Peyton, or with a creditor's bill against George L. Peyton.
The record shows that a separate order was entered in the
creditor's bill suit, on the 7th of December, 1886; and a sepa-
rate order entered in this chancery cause here appealed from;
and that the order entered in the common law case referring
it to a commissioner was entered on the 16th of November,
1887, nearly a year afterwards. In the petition for appeal in
this case now before the court, there is no reference whatever
to either of the other cases; the only matter complained of
being the decree rendered in this case July 3d, 1889, in favor
of Stuart against Peyton for $6,198.27, the petition of appeal
saying " *this is the decree here complained of*," and making, as
before said, no reference to any other decree, or judgment
whatever. The only foundation on which the assumption that
the parties, by their counsel, agreed that these three other
cases should be heard along with this one in which the appeal
is taken, and that all of them should be decided upon the
appeal in this case, is a total misconstruction by this court of
a statement by the commissioner in his report, that as there
was a defence common to all the cases the commissioner would,
" to save time, repetition and expense," present his views fully
and in detail in one of his reports; and in his other reports in
the other cases refer to them, as there presented, instead of
writing them out at length and with useless verbatim repe-

tition of the same matter in each case. This was understood and agreed by counsel -merely to save time, useless repetition and expense; and was in no way intended to make them one cause, as is shown by the course of. the commissioner and of counsel, and as plainly appears by examination of the facts. Peyton had disclosed his defence, which was common to all, that Stuart had bought his stock in the Greenbrier White Sulphur Springs Company, and had agreed to assume all his liabilities as endorser for the said corporation. Under these circumstances it was apparently unnecessary to take the same evidence over in each case, and for the commissioner to make an elaborate review of the same evidence in each case; and, to avoid this, it was agreed that the evidence should be taken in one case and reviewed by the commissioner and report made; and that in the other cases the commissioner should make his report of the findings, referring to his elaborate and extended report for his reasons.

Notwithstanding the fact that the common law suit in which a judgment was rendered in favor of Stuart against Peyton, upon pleas of offset and counter-offsets, for $14,105.70 and costs, with interest on $12,417.61, part thereof, from May 1st, 1889, is not before this court by this appeal, the time having long elapsed within which it would be lawful to ask for·or to obtain a writ of error in the case, yet that judgment is reversed by the decision of this court; and in lieu thereof a judgment is entered in this court, upon this appeal, in favor of Peyton for $5,000, with interest from November 4th, 1882, and costs. A transcript in the record in this common law case is interpolated into the record of the chancery case in which this appeal was granted; but this was done without authority, and more than a month after the appeal was allowed; and it has never in any way—by amendment of the petition of appeal, by *certiorari*, or otherwise—been made a part of the record in the case brought up and under review on this appeal. The creditor's bill suit, in which a decree of sale was rendered at the

May term, 1890, of the circuit court of Augusta county, is not before this court, no appeal ever having been asked for or granted from that decree. The chancery suit of Stuart against Peyton and Lancaster & Company is not before this court by this appeal in this case, there having been as yet no decree therein to be appealed from.

This chancery suit now before this court by appeal was instituted in September, 1886, by William A. Stuart against George L. Peyton, to enforce contribution from the defendant Peyton to said Stuart upon certain negotiable notes of the Greenbrier White Sulphur Springs Company, jointly endorsed by the said Peyton and said Stuart, which were wholly paid by Stuart. In this suit a final decree was rendered on the 3d day of July, 1890, in favor of Stuart for the sum of $6,198.27, with interest, as aforesaid, from May 1st, 1889, on $4,800.21, part thereof, and the costs.

After the filing of the bill and the answer in this case, the court made an order directing one of the commissioners of the court, J. W. Green Smith (himself an able and accomplished lawyer) to inquire and report as to the solvency or insolvency of the Greenbrier White Sulphur Springs Company, and of one of the co-endorsers, H. M. Mathews; and also to calculate and state and report what was "the *amount*" of Stuart's co-endorsers' liability to him, Stuart, for contribution. Commissioner Smith, after the most searching investigation of every record and other evidence pertaining to the matter, and after weighing carefully all the arguments presented by Peyton and his counsel, made an exhaustive review and report in the case, disposing completely of every point made and defence relied on by Peyton, which was approved and adopted by the court and made the basis of the decree of July 3d, 1889; and which demonstrates conclusively that the decree complained of is right and ought to be affirmed by this court.

There are but two errors assigned in the petition for appeal. First, that the court erred in holding the defendant, George

L. Peyton, liable for contribution, because, after the execution of the notes in controversy, Stuart bought Peyton's stock in the Greenbrier White Sulphur Springs Company on the *basis of cost*, and that, by the terms of that purchase, Peyton was (as petitioner alleges) released from liability on account of said Springs Company; this assignment of error, the petitioner says, "is vital, and covers the whole ground of controversy." The second assignment is that the court erred in overruling the petitioner's motion for a *continuance* at the May term, 1889, of the said court. The opinion of the *majority* sets forth fully the reasons *urged by Peyton's counsel* for assigning as error the "circuit court's refusal to continue the cause" another term, but fails to make any allusion to the reasons which the circuit court spread upon the record in the *nunc pro tunc* proceeding, for not continuing the case; and, saying that the consideration of that assignment of error will be waived for the present, waives it altogether, and takes no further notice of it in the opinion; which affords the inference that it was not well taken.

The opinion of the majority then proceeds to consider the case under review by this appeal, on its merits; and in so doing copies, almost in full, into the opinion, Peyton's answer in the case, and likewise his deposition, while not the slightest notice or consideration is given to the abundant record evidence filed in the case, which shows the utter fallacy and inadmissibility of Peyton's pretentions. Peyton and Stuart made their own contract for the sale and purchase of Peyton's stock, and reduced it to writing. It is signed by both the parties and filed with the record. It is clear, well defined, carefully guarded in its terms, and unambiguous; and there is not the slightest intimation or implication, even in argument, of any fraud, mistake, or undue advantage in the execution of the contract. Peyton admits that he executed the paper, and that Stuart positively and persistently refused to sign any other; and yet the opinion of the *majority* proceeds; in utter disregard of the solemn written contract, to adopt Peyton's unsupported oral

statements outside of, and in absolute contradiction and contravention of the writing, and to cons'rue the contract by *Peyton's oral evidence,*, instead of by the plain, positive, and unmistakable terms of the written instrument, which construes itself, and which, the law says, cannot be varied, contradicted, added to or taken from; and which, if lawful and made in good faith, the court shall enforce as made by the parties. Every contract lawfully made between parties competent to contract and dealing on equal terms, or, as the phrase is, "at arm's length," in good faith and without fraud or mistake, which is embodied in unambiguous terms in a duly executed writing and signed by the parties to it, *is its own interpreter;* and the courts have no lawful power to construe it, nor to admit any testimony outside of itself to modify or affect its operation. The terms of a valid, written contract cannot be contradicted or varied—much less squarely contravened—by parol evidence of what occurred between the parties previously thereto, or contemporaneously therewith. (See *Greenleaf on Evidence*, chapter 15, and, especially, sections 275, 277, 281; *Watson* v. *Hunt*, 6 Gratt. 633; *Towner* v. *Lucas*, 13 Gratt. 705; *Woodward, Baldwin & Co.* v. *Foster*, 18 Gratt. 200; *Sangster* v. *Gordon & Riley*, 22 Gratt. 413; *Colhoun and Cowan* v. *Wilson*, 27 Gratt. 646; *Miller* v. *Fletcher*, 27 Gratt. 413; *Southern Mutual Insurance Co.* v. *Yates*, 28 Gratt. 593; *Barnett* v. *Barnett*, 83 Va. 508; *Tait's Executor* v. *Central Lunatic Asylum*, 84 Va. 279; *Shenandoah Valley R. R. Co.* v. *Dunlop & Wife*, 86 Va. 352.)

Here we have two intelligent men making a contract, which is finally reduced to writing and signed by both parties. While chaffering about the terms of the contract, Peyton makes a proposition or stipulation which, he admits, Stuart refused to put in the contract. Peyton then gets able counsel to prepare a written contract-paper embodying his rejected proposal, which he took to Stuart, and which, he says, *Stuart refused to execute;* and flatly refused to treat upon the terms

therein proposed. When he took to Stuart this paper prepared by his counsel, which Stuart instantly rejected and refused to consider, Stuart then had in his pocket or possession a paper, duly signed by Peyton, giving him an *option* to purchase or sell Peyton's stock, upon the explicit terms therein set forth, which. Peyton had signed and delivered to Stuart after he had taken it to his counsel, Colonel Gordon, who added to it the fourth, and final clause. The paper, on its face, gave an *option* which Stuart was to accept, if at all, in writing, before 3 o'clock P. M. of that 4th day of November, 1882. This he did do by signing the said paper:

"I accept the above.

"W. A. Stuart."

And Peyton signed again the paper:

"*Above acceptance in time.*

"G. L. Peyton."

Thus making this option-paper the final, executed, delivered, and accepted contract between them. Yet the opinion of the *majority* of this court utterly wipes out of existence this solemn, explicit contract in writing, made and signed by the parties; and makes for them a new contract, based entirely upon the *oral* and self-contradictory testimony of Peyton himself only; all and giving to him, with a sweeping and all-embracing. exuberance, all and even more than he had asked, and which Stuart had pointedly and persistently refused, and against which he had, presciently, guarded himself by a solemn, written contract, which is not only uniquely *inclusive* of the terms agreed and clearly defined, but which is expressly *exclusive* of the claim set up by Peyton, and the very conclusion announced in the opinion of a majority of this court.

Even if language were adequate to express the amazement

and alarm excited by this spectacle, we are restrained by judi-
cial propriety from any comment, except the inquiry how, now,
after this opinion of the *majority* of this court, any parties in
Virginia may or can contract in writing, with either safety, or
confidence that their rights will be conserved, and that any
contract, which the human language can embody, will not be
*construed away* by the courts?

The Greenbrier White Sulphur Springs property had been,
up to the 29th day of December, 1880, in the hands and under
the management of various lessees, who were syndicates and
mere *partners*; and it had become overborne with indebtedness
of over a half million of dollars—nearly double the estimated
value of the property—and it was involved in litigation in both
the State courts and Federal courts, under whose decrees it was
sold at public auction.    On the said 29th day of December, 1880,
" The Greenbrier White Sulphur Springs Company " organized
regularly under a charter of incorporation granted by the state
of West Virginia, and the very next day, viz: December 30th,
1880, they issued to the various stockholders, in proportion to
their respective subscriptions, certificates of stock to the amount
of $150,000 of capital stock *full paid up.*    Three hundred and
seventy-five shares of the said stock had been subscribed for
by Peyton, but the certificates of said stock were, by agree-
ment between Peyton and Stuart, turned over to Stuart as
collateral security for the subscription money for the stock,
the whole of which ($17,500) had been advanced and paid by
Stuart for Peyton; who, up to this day, has never paid a dollar
for the same.    Peyton gave his negotiable notes for the said
advancements, which Stuart carried for him, until by the
interests and discounts paid by Stuart it amounted on Novem-
ber 4th, 1882, to $19,000.    This was the cost of the acquisi-
tion of the said stock to Peyton; and these negotiable notes
of Peyton were Peyton's *paper*, referred to in the following
contract, and which were all paid by Stuart and returned to
Peyton.

On the 4th day of November, 1882, the day upon which the Greenbrier White Sulphur Springs Company leased the property to H. Phœbus, the following paper was executed:

"I, George L. Peyton, do hereby sell to W. A. Stuart my stock in the Greenbrier White Sulphur Springs Company, of West Virginia, on the basis of cost, which cost is represented by my notes in the hands of said Stuart, and the matter of discount and interest paid for me by said Stuart. These notes are to be returned to me as paid out. In addition to the above, said Stuart is to pay my debt to Dr. Moorman (of about $4,000) and enough in addition to make the sum of $5,000, within ten or fifteen days. This contract is binding on me until 3 o'clock this P. M., between now and which time said Stuart is to accept the same in writing, if he so elects, and place said writing of acceptance in my hands.

"4th. In addition to the above, it is further agreed that said Stuart will pay to said Peyton the amount of his (Peyton's) uncollected salary for the present year, up to the 1st day of January, including the amount of board bill for Stuart and family at the White Sulphur Springs during the past summer, which was paid by said Peyton for Stuart and credited to the one-fourth of the superintendent's salary to which said Stuart was by contract entitled.

"Witness my hand and seal November 4, 1882.

". "George L. Peyton, [Seal.]""

"I further agree to put no obstacles in the way of said Stuart and his associates in their efforts to regain and hold the control of said Greenbrier White Sulphur Springs.

. "George L. Peyton."

"I accept the above.

"W. A. Stuart."

"November 4th, 1882."

" Above acceptance in time.

" GEORGE L. PEYTON."

The foregoing contract was put first in the form of an option, because Stuart did not wish to buy Peyton's stock himself, but that Phœbus might become the purchaser and thus be interested as a stockholder as well as a lessee of the Greenbrier White Sulphur Springs property. Accordingly he that same day sold and transferred to Phœbus the stock, which he had bought from Peyton, for the price or cost of it set forth in the option contract.

Peyton files with his answer a paper signed by Stuart alone, which does not bind Peyton, and does not transfer the stock; and which shows on its face that it is a hurried memorandum or substantial duplicate of the transaction between Peyton and Stuart evidenced by the option paper, to which it obviously refers in its very terms :

" RICHMOND, VA., November 4, 1882.

" I have this day bought of George L. Peyton his stock in the Greenbrier White Sulphur Springs Company, on the basis of cost and $5,000. I am to give him up his paper, including discounts and interest paid, and pay Dr. Moorman about $4,000 and enough in addition to make $5,000 : said Peyton is to have his salary on the 1st of January, so far as it has not been realized from the company, after taking from his account and charging back to said Stuart any board bill against said Stuart or his family which has been charged to said Stuart.

" Said Peyton is to throw no obstacle in the way of said company regaining or holding possession of their property, and I release any claim I have to any of his salary. Any amount I pay said Peyton on his salary, I am to hold as a debt against the White Sulphur.

" W. A. STUART."

Peyton claims that this paper is the contract by which he sold and Stuart bought his stock; and that though it does not either contain or import any release to him, and assumption by Stuart, of his indebtedness and liabilities as co-endorser upon the paper of the Greenbrier White Sulphur Springs Company; yet, that Stuart agreed *verbally* to give him the protection from all liability for the debts of the said company. Beside this bold assertion of his, in direct and wholesale contravention of his written contract, there is no vestige or semblance of evidence in the record, to give to his statement even a tinge of probability, even if it were admissible at all; and Peyton says Stuart gave no reason for refusing to sign the paper, giving him this protection or immunity from his liabilities as endorser upon the paper of the Greenbrier White Sulphur Springs Company, which out of abundant caution he had Colonel Gordon to prepare for him; *and that he did* not *ask Stuart why he refused to put in writing what he had agreed to verbally.* While, on the other hand, Stuart positively and emphatically denies that he, at any time, verbally or in writing, agreed to give Peyton protection from the debts of the company; declaring (what Peyton himself proves) that he " flatly refused to do so," over and over again; and that nothing was ever written or spoken from which Peyton could draw such an inference; that it was absolutely untrue that he ever admitted to Peyton that the words "*basis of cost*" in the paper filed by Peyton were used, or intended to release Peyton from, or protect him against, liability for the debts of the company; or that they were in fact so used, or that they were at the time the paper was given supposed to be susceptible of any such construction.

The option paper embodies a complete contract, signed by both parties and binding both; while the paper asserted by Peyton to be the contract between him and Stuart is signed by Stuart alone, and binds Peyton to nothing. Is it credible that Stuart would have closed the contract and reposed his title to the stock purchased, upon a mere memorandum given to

Peyton, and taking nothing from Peyton by which Peyton would be bound to let him have the stock upon the terms agreed; and that, too, when his avowed object was to procure from Peyton a paper upon the presentation of which to Phœbus he could induce Phœbus to become the purchaser?

Is it credible, or even possible, that Peyton, after Stuart's positive and unqualified rejection of his importunity that Stuart should stipulate, for his exemption from and Stuart's assumption of, Peyton's liabilities as endorser for the Greenbrier White Sulphur Springs Company; and after Stuart's refusal to sign or consider the paper which Colonel Gordon had prepared for Peyton, giving him this exemption and protection, and which he took to Stuart *because he thought " it would be safer to have in writing "* what had been verbally agreed; that Peyton should have contented himself, without a word of inquiry from him or explanation from Stuart why he refused to put in writing what he had agreed to verbally, with only the paper containing the words " basis of cost " as his protection? Is it possible or credible that, if the words " *basis of cost*," in the paper which Peyton asserts, were (as he alleges) understood and agreed between Stuart and himself, to mean that he was to be protected against his fixed liability for the debts of the company, and that Stuart was to assume them, he, Peyton, should have subsequently signed the option paper and delivered it to Stuart with the explanatory words following " basis of cost,"—" which cost is represented by my notes in the hands of said Stuart, and the matter of discount and interest paid for me by said Stuart "? But, leaving out of view all the argument of probabilities and congruities, it is difficult to understand how the words " *basis of cost* " can be held (as they have been held in the opinion of the majority of this court) to mean that Peyton was to be protected against his liability as endorser for the Greenbrier White Sulphur Springs Company, when (as is clearly demonstrated in the commissioner's report) that liability could not possibly have

entered into or been considered part of the *cost* of his stock, which was issued to him as *full paid stock*, and assigned by him to Stuart as collateral security for the subscription price of obtaining that stock (every dollar of which had been advanced for him by Stuart) *previously to his said endorsements on the paper issued by the Greenbrier White Sulphur Springs Corporated Company?* In the opinion of the *majority*, it is held that the money borrowed upon the notes of the Greenbrier White Sulphur Springs Company (which was a corporation and not a partnership) which were endorsed jointly by Peyton and Stuart, having been used in the improvement of the property, constituted, to the extent of Peyton's liability thereon, a part of the cost of the stock sold by Peyton to Stuart; yet it clearly appears in the record that not one of the notes on which Stuart claims contribution from Peyton as co-endorser, nor the note on which he claims that Peyton is liable to him as prior endorser, was executed or endorsed by Peyton, until long after Peyton's shares of stock were issued to and held by him as full paid stock; and, nevertheless, this opinion of the majority of this court holds, that the stockholders of a corporation, after having paid for and received all the shares for which they subscribed, can, by subsequently endorsing for the company's accommodation, treat any amount that they may be compelled to pay because of such endorsement, as a part of the " *cost* " of that stock, when the money so borrowed by the corporation has been used in improving the property, not of the stockholders, but of the corporation itself. This may be true as to the sale by a *partner* of his interest in a *partnership*, on " the basis of cost," without saying more; but it cannot possibly be so as to a sale of stock in a *corporation*, which differs from a partnership in many essential and conspicuous particulars. A corporation is a legal entity, quite and wholly independent of the individual stockholders therein; and an endorsing stockholder of a note of the corporation can set up any defence thereto which a stranger could maintain against

any holder of the note, even though the holder be a co-endorsing stockholder.   Partners are bound jointly and severally out of their private estates, if necessary, for all partnership debts; but a stockholder of paid up stock in a corporation is not bound for any part of the corporate debts.   A partner, as to the property of the concern, has an undivided ownership therein, and in all improvements thereon; but a stockholder in a corporation has no individual interest in or liability for the property of the concern or its debts.   The "*basis of cost*" of stock in a corporation could not keep on swelling indefinitely as between the corporation and the individual stockholders, after the stock is paid for in full and certificates of stock issued and held; and even though it were true (as the commissioner in his report shows that it is not) that the proceeds of the notes endorsed for the corporation by Peyton and Stuart and others, were used by the corporation in making improvements of its own property; yet it must be remembered that the men composing the corporation were not *partners*, but stockholders and corporators having no individual interest in the said property or the improvements thereon.

It appears by report of commissioner W. J. Leake that the Greenbrier White Sulphur Springs Company was, on the 4th day of November, 1882, hopelessly insolvent; that its known and admitted debts exceeded the value of its assets of every description by the sum of $328,000.48; and yet, by a forced and unnatural construction of the words "*basis of cost*," used in a written contract for the sale and purchase of Peyton's stock in that insolvent company on that day (which had cost Peyton, with interest and discounts, all advanced and paid for him by Stuart $19,000), Stuart is now adjudged by this court, reversing and annulling the judgment and ascertainment of the commissioner and judge of the circuit court of Augusta county, to have assumed by the words "*basis of cost*" to pay, for this totally worthless stock, all of Peyton's liabili-

ties as endorser for the Greenbrier White Sulphur Springs Company; amounting, with the $19,000 advanced for Peyton by Stuart for the said stock, to the enormous sum of $73,776.18! And that, too, when the record distinctly shows that Stuart could at any time up to the · day before November 4th, 1882; (when he is adjudged to have done this idiotic and incredible thing), have sold or bought Peyton's said stock for the price fixed by Peyton in a written authority given by him to Stuart, $22,500. This paper was produced and filed by Peyton himself on the cross-examination of Stuart, as follows:

> " WHITE SULPHUR SPRINGS,
> GREENBRIER COUNTY, WEST VIRGINIA,
> *August 30th, 1882.*

" I have taken authority to sell the stock of G. L. Peyton in the Greenbrier White Sulphur Springs Company on terms which I may approve. These terms are sixty cents on the dollar, and relieve said Peyton from the extra charge upon his salary for carrying his paper, except that said Peyton has undertaken to pay the bill of (self) himself and family this summer at the White Sulphur, to go as a credit on said charge. That is, if I sell, I am to make no further claim to his salary than the bill aforesaid. The authority to be in force for sixty days.

> " W. A. STUART."

In the face of this paper in the record (which, be it remarked, contains no stipulation or the remotest implication that Peyton was to be relieved from his liabilities as endorser upon the paper of the company), the opinion speaks of Peyton's stock as being worth $40,000 (of which there is no proof whatever except Peyton's unsupported statement); and argues (adopting Peyton's statement) that it is inconceivable that Peyton, who had very recently refused to sell his interest for $40,000, should

have been willing to sell to Stuart at $19,000. It is to us utterly astounding that this assertion and attempted argument could have been made in the opinion of the *majority* with this paper in the record before it, showing that, for several months prior and up to the 4th of November, 1882, Peyton was anxious, and Stuart had been trying, to find a purchaser for Peyton's stock at sixty cents in the dollar.

Stuart, a man of unusual intelligence, business capacity, grasp and thorough knowledge of all the details of the indebtedness of the Greenbrier White Sulphur Springs Company, and the value of all of its assets upon which he had *liens* for $417,725.17, knowing that the stock of the company was not worth a dollar on the market; yet, with an eye to the *speculative* value and *proper management* of the immense property, was anxious to get rid of Peyton as the *manager* or superintendent of the enterprise, and to get the property under the management of *Phœbus*, a hotel man of great wealth, experience and wide fame, and especially to get the property out of the hands of Peyton, as curator or receiver of Judge Jackson's court in West Virginia, and thereby to rescue the property from further litigation, into which he suspected it had been precipitated by Peyton's instigation. He, therefore, having already paid for Peyton $19,000 on the "cost" or acquisition of the stock to Peyton, became himself the purchaser of Peyton's stock on 4th of November, 1882, for the cost to Peyton $19,000, plus a bonus of $5,000, and a release to Peyton of his contract—claim to a part of Peyton's salary as superintendent, making in all over $24,000, a clear profit of over $5,000 on $17,500 cost of stock for which he had subscribed, but for which he had never paid one cent. Yet, the opinion of the majority of this court winds up with the pathetic summary: "He (Stuart) began this controversy by which he has caused all his contracts with Peyton to be set at naught  *  *  *  but, sweeping away every defence set up by Peyton, he has overwhelmed him by the help of the commissioner and the circuit court, under a load of debt of

$70,000 and more, on account of these very debts of the company which passed under his control into his hands, and which he agreed *to pay with the property turned over to him*. He has all of Peyton's interest in the Springs property, and holds Peyton bound for the debts contracted by the company in making the Springs property what it is—has Peyton's $35,000 worth of furniture (by his own valuation) for nothing."

Here is a solemn deliverance of the majority of this court, upon the record in this case, that Stuart (as "John Doe "might have done), by the purchase of Peyton's $17,500 cost of worthless stock in an insolvent incorporated company, by the mere use of the words "basis of cost" in a written contract, agreed to pay *$70,000 and more* of Peyton's individual liabilities as endorser on the notes of the Greenbrier White Sulphur Springs Company, and to do it with the property ($17,500 of worthless stock) turned over to him by Peyton, for which Stuart had already advanced the whole cost, and of which he already had possession, and a lien as collateral security by assignment from Peyton. *Peyton had no interest whatever in the "Springs property;"* and all that was ever "turned over" to Stuart by Peyton was worthless stock, and the privilege of paying, in addition to the $19,000 which he had already paid for Peyton, a bonus of over $5,000. As to "Peyton's $35,000 worth of furniture," which the opinion says Stuart "has for nothing," the record shows (what the commissioner reports) that the "old furniture purchased of George L. Peyton & Co. (an extinct partnership, by a new syndicate or partnership of which Peyton was himself a member), did not form any part of the basis on which the Greenbrier White Sulphur Springs Company, organized as a chartered corporation, issued the $150,000 of paid up stock;" and "that as to this old furniture, or even its use, or the purchase money thereof, said George L. Peyton *individually* had not a single dollar's interest therein, the whole of said purchase money having gone, as far as it would reach, towards the payment of the debts of the late firm of George L. Peyton & Co."

In 1879, and for several years previously, the "White Sulphur Springs" property was in litigation and under the control and custody of the Federal courts of West Virginia; and a partnership firm, "George L. Peyton & Co.," composed of R. H. Catlett, J. Frederick Effinger, George L. Peyton and others were *lessees* of the Springs property from the said court, until they were sold under a decree of that court on the 31st day of March, 1880; when the property was bought for the bid of $340,000 by Stuart for a syndicate or partnership composed of himself, *Peyton*, Mathews, Camden, and Thompson. On the 1st of May, 1880, this association of individuals bought the personalty from the former lessees, George L. Peyton & Co., consisting of old furniture, carriages, live stock and other equipment at the price of $35,000. For this old furniture, &c., there was a suit brought and recovery had in the suit of Effinger, &c., against Stuart and his said associates (*of whom Peyton was one*) of $27,519.30; of which Stuart paid his own third, $9,173.10⅓, and Peyton's third, $9,173.10⅓, and Camden and Thompson paid their third. This is the history of "Peyton's $35,000 worth of furniture," which the opinion of the *majority* says, so touchingly, Stuart "has for nothing."

The organized, chartered corporation, the Greenbrier White Sulphur Springs Company, never bought the "old furniture;" and Stuart's only relation towards it was the same as that of Peyton, his associate in the purchase, and the high privilege of paying not alone his own adjudged one-third liability therefor, but that of Peyton withal, at the suit of George L. Peyton & Co.'s creditors! But more than this—if more were not superfluous—in the suit of *Effinger, &c.* v. *Stuart, Peyton and others*, in the circuit court of Augusta county, for the balance due on the purchase of the furniture of George L. Peyton & Co., a final decree was rendered five years before these suits of Stuart against Peyton were instituted (*from which no appeal was ever taken*), subrogating Stuart to the rights of the receiver against Peyton for his contributive share of the recovery, which was paid by Stuart for him, and declaring that, as to the share

of Peyton so paid by Stuart, Peyton and Stuart occupy the relation of principal and surety."

" Thus it incontestably is plain, that Peyton's liability to Stuart for his contributive share of the recovery for the balance due for the furniture bought from the old partnership of George L. Peyton & Co. is *res judicata;* Peyton having, in that suit, put the very matter in issue upon precisely the ground upon which he now insists that he is not liable to contribution in this case under review. And this decree, subrogating Stuart to the rights of the receiver against Peyton, is the lien upon which the creditor's bill suit of Stuart against Peyton is founded; together with a judgment, which was also audited in that said suit, rendered in favor of Stuart against Peyton some ten years before these suits for contribution were brought by Stuart against Peyton." The opinion of the majority says, and lays great stress upon it, that " Mr. Stuart testifies that, early in 1881, Camden and Thompson sold their stock to R. A. Lancaster on the *basis of costs.*" Upon turning to that sale by Camden and Thompson of their stock in this company, which Stuart says was upon the *basis of costs,* we find what Mr. Stuart's definition of this term is when it does not affect him. And then, because the written contract of sale between Lancaster and Camden and Thompson (made early in 1881, when the Green-brier White Sulphur Springs was prospering and not then embarrassed and discredited by litigation) contained an *express stipulation* for the assumption by Lancaster of the liability of Camden and Thompson as endorsers on the paper of the company, the triumphant *non sequitur* is asserted, that Stuart, in referring to this, more than six years afterwards, *thereby admitted* that the mere words " *basis of cost,*" in *his contract* with Peyton, meant that he thereby assumed to pay all of Peyton's enormous outstanding liabilities as endorser for the Greenbrier White Sulphur Springs Company. The contract between Lancaster and Camden and Thompson contained this stipulation; it is enough, logically, to say that the written memorandum of

contract given by Stuart to Peyton does *not* contain it—even leaving out of view the contemporaneously executed contract signed by both Peyton and Stuart, which carefully, guardedly, and with evident forecast, says " on the basis of cost, *which cost* is represented by my notes in the hands of said Stuart, and the matter of discount and interest paid for me by said Stuart." But it is unfortunate that, when the opinion of the *majority* of this court undertook to quote the exact statement of Stuart, and *to make it the basis of a crushing conclusion against Stuart*, it did not quote him either accurately or justly. Mr. Stuart did not say—" Camden and Thompson sold their stock to R. A. Lancaster *on the basis of costs.*" But, most essentially different, in terms and in substance, he did say : " Very early in 1881 Camden and Thompson sold out their stock to Lancaster, or Lancaster & Co., on the basis of cost, *or cost and interest,* amounting to $18,375, as of May 31st, 1881." Not only did he not say " on the basis of *costs* " and stop there, but he said " on the basis of *cost,* or *cost* and interest, amounting to," &c. ; and he was, at the time and in the very suit in which this deposition was given, insisting that the words " *basis of cost* " in the memorandum which he had given to Peyton five years before, did not, and were not intended to, import indemnity to Peyton, and assumption by him of Peyton's liabilities as endorser on the paper of the Greenbrier White Sulphur Springs Company.

The *majority*, in arriving at the conclusion announced in their opinion, have not only adopted the oral statements of Peyton absolutely, and have totally disregarded Stuart's testimony and Peyton's written contract in direct conflict with his unsupported parol statements, but they have utterly ignored the rule that when *two papers* (as these were) are executed at the same time, as parts of the same transaction, by and between the same parties, touching the same subject-matter, any actual or supposed ambiguity that may be in either of them, *must* be explained by the other, *and not by parol evidence.* And *a fortiori,*

not by the mere allegations of one of the parties to the written instrument, in direct and diametrical contravention of it.

It is wholly immaterial, in legal effect, which of these papers—the option contract or the Peyton paper—was written *first;* there is no conflict between them, and they were both executed in a few minutes (as Peyton says) as parts of the same transaction; and, as matter of law, if there were (as there is not) essential contrariety between them, the *option* contract, signed by both Peyton and Stuart, just as the negotiations ended and they were separating, both in a hurry to catch departing trains, would be the consummation and the *evidence* of their contract.

There is no connection or relation between the shares of stock held by a stockholder in an incorporated company, and the liabilities or debts incurred by that individual stockholder, whether they be in aid of the corporate enterprise or otherwise; and it passes all understanding, how it can be held (as the opinion of the majority does hold) that the purchase of shares of stock upon the " *basis of cost* " of the acquisition of that stock, implicates and obligates the hapless purchaser to assume all the liabilities, actual and contingent, which may have been already *or subsequently* incurred by that stockholder's endorsements of the paper of the corporation. When this idea first entered Peyton's head or heart does not appear; but it was certainly after the 29th of September, 1883, when he gave his deposition in the suit of *Hodges & Bro.* v. *Greenbrier White Sulphur Springs Company,* in the United States court at Charleston, West Virginia, in which he files his petition as one of the endorsers for the said company, and in his deposition says: "I am jointly bound as endorser with W. A. Stuart and H. H. Mathews on a number of negotiable notes made by the Greenbrier White Sulphur Springs Company, aggregating about $65,000 ;" and after giving a list of the notes, he says : " some of these notes have been assigned to W. A. Stuart, who is now the owner thereof, and *holds me jointly liable for them.*" Neither in this deposition,

nor in the petition filed by him in the suit, does Peyton make the slightest intimation that Stuart had agreed, or was bound, to protect him against his liability as joint endorser on these notes.    And more than five years after the sale of the stock to Stuart by the contract dated November 4, 1882, Peyton filed, as an offset in the common law suit against him by Stuart, the stipulated bonus of $5,000 in that contract, and did not intimate, by plea or otherwise, any other immunity from the demands of Stuart for contribution on account of the large payments which Stuart had made for him because of his endorsements for the company.    Can it be supposed that Peyton, desperately in need of money, by his own evidence, would have held a debt of $5,000 against Stuart for more than five years without asserting or enforcing it, if he had not known that he was in debt to Stuart on account of Stuart's heavy payments made for him as his co-endorser.

The opinion of the *majority* refers to one or more letters which passed between Stuart and Peyton, subsequently to the contract of sale of the stock on November 4th, 1882, as evidence tending to show that Peyton then claimed, and Stuart admitted impliedly, that Peyton had been released from liability for these endorsements.    An examination of those letters, through any other medium than the spectacles of Peyton and his counsel, will not only, not warrant the inference, but will show exactly the contrary.

Peyton's acts from the time the contract was made, November 4, 1882, are utterly inconsistent with his present parol contradiction of his admitted, *thrice* signed, written contract; even if it were admissible in law for him, by his own unsupported verbal statements, to contravene a solemnly attested instrument, the due execution of which he unqualifiedly admits.

There are many and broad incompatibilities of sequence in the order of the negotiations and the execution of the *two* papers on the 4th of November, 1882, *as stated by Peyton;* but

we feel it to be unnecessary and unpleasant to protract this dissertation by any further exposition of them. It is said in the opinion of the *majority* :—" The learned counsel for the appellant has referred us to many circumstances, which show in the record that Stuart's memory was very frail, and where he appears to be contradicted ' by incontrovertible circumstances, and, indeed, by his own admissions. We have given these careful examination and consideration, and we find them in every case sustained by the record, but we cannot follow that line of discussion further within the reasonable limits of an opinion already too long."

We affirm, that an. examination of the testimony in the record will not justify this conclusion; but, supposing Mr. Stuart's memory to have been, as to some irrelevant matters, as frail even as the opinion of the majority declares it was, it by no means follows that his testimony in this case should be disregarded, supported as it is by the acts and admissions of Peyton, and by what was reduced to writing and signed and countersigned by Peyton at the time; and which makes it impossible to doubt that the " *cost*," upon the " *basis* " of which the parties contracted, was represented by Peyton's notes in the hands of Stuart, which he had given for the stock, and which Stuart had carried for him, paying the discounts and interest thereon in bank, as explicitly and guardedly set forth in the contract itself. Stuart held no other *paper* of Peyton's. Considering the very large property interest of Mr. Stuart involved in the controversy, and his good name, withal, reflected on by the opinion, it is to be regretted that the many (nor any single one) of the " incontrovertible circumstances and admissions of Stuart," which the opinion says " the learned counsel for the appellant has referred us to," and which " we find in every case sustained by the record," have not been specified or even referred to; and whatever *inspiration* may be drawn from the arguments of counsel, however able and learned, the *record* only is the guide of an appellate court.

This dissenting opinion cannot retrieve the destruction of Mr. Stuart's rights; but we deem it due, alike to his just fame and to ourselves, to make this exposition of the *facts* and the *law* of this case.

LEWIS, P., concurred with FAUNTLEROY, J.

DECREE REVERSED.